# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2011

## RHYNUIA L. BARNES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542    Steve Dozier, Judge**

---

**No. M2010-01554-CCA-R3-CO - Filed October 27, 2011**

---

Petitioner, Rhynuia L. Barnes, appeals the trial court's summary dismissal of his petition for writ of error coram nobis. In the petition he contends that in a letter purportedly written by his now deceased father, his father confessed to the murder for which Petitioner was convicted. Petitioner asserts that the letter constitutes newly discovered evidence. After a thorough review of the record, we conclude that the trial court did not abuse its discretion when it denied the petition for writ of error coram nobis. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. DAVID H. WELLES, SP.J., not participating.

Rhyunia L. Barnes, *Pro Se*, Pikeville, Tennessee.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Following a jury trial, Petitioner was convicted of premeditated first degree murder and sentenced to life imprisonment with the possibility of parole. On appeal, this Court affirmed the conviction. *State v. Rhynuia Lamont Barnes*, No. M2001-00631-CCA-R3-CD, 2002 WL 1358717 (Tenn. Crim. App., June 24, 2002) *perm. app. denied* (Tenn., Dec. 2,

2002). The facts surrounding Petitioner's conviction were summarized by this Court on direct appeal as follows:

Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim were home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the defendant, whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the defendant wanted. Martin said she next saw the defendant brandish a pistol, at which time the victim ran back inside the house. The defendant then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the defendant ran to her backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.

> Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the defendant was in the backyard. The defendant then ran back inside her front door holding his gun. The defendant then said twice that he would shoot the victim's mother if the victim did not come out of hiding. At that point, the defendant ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the defendant's father, entered the residence and inquired about his son. Martin told James Barnes the defendant went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the defendant's hand.

Tommy Morrell, a neighbor, testified that on September 2nd, the defendant arrived at approximately 3:00 p.m. riding in the front seat of a vehicle driven by an older man. Morrell testified the defendant requested he get the victim. Morrell further stated he went inside the victim's house and told the victim "two guys" wanted to see him, and Morrell exited the house. When Morrell reached the front gate, he saw the victim step onto the porch. Morrell later

saw the defendant go inside the gate. Morrell further stated the older man was seated in the car.

Morrell explained he knew "something [was] going down," so he went back to his house and instructed his mother to stay inside. Morrell stated the older man exited the car; the defendant first ran in the house but then exited the house telling the older man that "[the victim] might have gone out the backdoor;" the defendant ran around one side of the house, while the older man ran around the other; the defendant ran back around to the front of the house and entered it brandishing a gun; the older man entered the house; and he heard a gunshot. Morrell stated he never saw the older man with a gun. On cross-examination, Morrell denied receiving drugs as compensation for summoning the victim outdoors.

Metro Police Officer Jerry Bottom testified he arrived on the scene within one minute of receiving the dispatch and saw the defendant running across the street holding his waistband. Officer Bottom stated his first priority was the victim, and since a second cruiser had arrived, he entered the victim's residence through the open front door and found the wounded victim on the floor. Officer Bottom stated he saw a man standing by a parked car when he initially arrived; he was unsure if the defendant ran from inside the home; and the interior of the home exhibited no signs of a struggle.

Metro Police Officer Marshall James Brown testified he and his partner, Officer Chris Locke, arrived at the scene immediately after Officer Bottom. Officer Brown stated that while he and Officer Locke were walking toward the residence, the defendant ran from across the street and dove head first into the backseat of a parked car. He additionally stated James Barnes walked toward the vehicle's driver's side. He and Locke then detained them, and Joyce Martin identified them as the persons in her home. On cross-examination, Officer Brown stated James Barnes was bleeding from a cut on his hand.

Officer Chris Locke corroborated Officer Brown's testimony. He further testified the defendant made remarks after being arrested; he activated his pocket audio recorder to record the defendant; and he made notes during the defendant's outbursts. He testified the defendant, while being handcuffed, stated that the victim should not break in his house and steal his jewelry. At that point, Officer Locke placed the defendant in the rear seat of the cruiser, activated his pocket audio recorder, and sat in the driver's seat for approximately one hour and fifteen minutes. Officer Locke also wrote down

the defendant's statements verbatim. Officer Locke testified from his written notes, which indicated the defendant said:

> I went in the house with him; I didn't shoot him; I threw my dope in the alley; that's why I ran. I ain't did nothing. I ain't got no gun; what [are] you detaining me for.... He needed to quit lying on me. He finded [sic] no gun on me. Why am I being detained? I ran and dumped my dope and came back ... No gun, no motive. I ain't got no lie to tell. I dumped my dope. He stole my jewelry.

At that point, other officers found a gun in the defendant's line of sight, and the defendant said, "Man, ain't found no gun on me. Man, how do you know it was me; that could have been anybody's. Whose gun? I know my lawyer will get me off. I got money; I got big money. Take me down so I can make bond." The defendant also stated, "Man, he steals $4,000 worth of jewelry and I'm supposed to let it ride. F* *k that s* *t, man."

Metro Police Investigator David Elmore testified he searched the area and found a gun hidden inside a plastic bag of clothing in a pile of garbage across the street from the victim's residence.

Metro Police Officer Charles Ray "Friday" Blackwood testified he searched the victim's residence and was unable to find a weapon; he recovered three live .38 shells from James Barnes' pocket; and the .38 revolver found in the garbage had five spent casings in its chambers.

Medical Examiner Dr. Bruce Levy testified the victim died as a result of three gunshot wounds fired from a distance of "greater than 18 to 24 inches" from the victim's body. Although Dr. Levy stated the victim had small abrasions on his chin, arm, back, and abdomen, he opined they were not the result of a struggle.

Danny Morris, a specialist in latent fingerprint analysis with the Metro Police Identification Division, testified a palm print was recovered from the weapon that did not match the defendant's print. Morris explained, however, this evidence did not definitively establish that the defendant never handled the gun since there are numerous reasons why one could touch a surface and not leave a latent print.

-4-

Metro Police Detective Kent McAlister testified he searched the crime scene and was unable to find a gun or spent shell casings. Det. McAlister stated although the defendant and James Barnes were initially both suspects, the charges against James Barnes were dropped at his preliminary hearing. He explained James Barnes was not initially fingerprinted because his hand was bandaged, and after the charges were dropped, it became impossible to obtain his prints.

Metro Police Detective Jeff West testified he assisted in interviewing the defendant at the police station. He testified that although he could not recall if the defendant and James Barnes were seated together while awaiting questioning, it was unlikely because standard procedure dictates they be separated. Det. West testified the defendant confessed to the crime and told him to release James Barnes because he had "nothing to do with it" and had tried to stop him from going into the Martin residence with his gun.

TBI firearms expert Steve Scott testified the shell casings and bullet fragments submitted for analysis were fired from the .38 revolver. Scott conceded the gun was not tested for the presence of blood or tissue, and it was possible for a person's hand to become injured if caught between the weapon's hammer and firing pin.

The defendant testified when he got in the car with his father, James Barnes, on September 2nd, he did so with the intention of receiving a ride to visit his son. The defendant stated his father requested the defendant direct him to the defendant's drug supplier, a person by the name of "Ricko," which the defendant did. After their arrival, James Barnes asked Ricko the location of his stolen jewelry, and they drove to the victim's residence to replevy the jewelry. The defendant stated his father parked his vehicle on the street near the victim's residence, handed the defendant the revolver, and told the defendant to place it in his pocket. The defendant testified the gun remained in his shorts until he handed it back to James Barnes. He stated that, under the instruction of James Barnes, he gave Tommy Morrell drugs to summon the victim outside.

The defendant further testified he and James Barnes walked toward the residence, and the victim exited onto the porch. When the defendant inquired, "where [is] the jewelry," the victim ran back inside the home. The defendant stated he then stepped in the front room of the house, and the victim's mother told him to "get out;" he exited and ran around the side of the house,

attempting entry through the back door; and since the door was locked, he returned to the front of the house where he handed James Barnes the gun. The defendant said he "[g]ave [James Barnes] the gun back [and] started out [of] the yard ... thinking he's coming behind me ... thinking it's over."

The defendant further stated once he arrived at the car, he realized his father had not followed him, so he reentered the residence, went to the rear of the home, and saw the victim run to the bathroom. He then attempted to open the bathroom door, which was either locked or being held, and as he started to leave the home again, James Barnes fired a shot through the bathroom door. After the shot was fired, the victim exited the bathroom and struggled for the gun with James Barnes. The defendant stated that after a brief struggle, James Barnes fired shots, handed the defendant the gun, and they exited the home. The defendant stated he then ran across the street and discarded his "eighty-ball" of "dope" and the gun. He stated that he ran back to the car because he thought he left his beeper in the car and then dove into the car.

The defendant stated he had no intention of killing the victim, and after he was arrested, he made admissions to Officer Locke because

> in [his] neighborhood, it's like, you try to make the polices as mad as you can by being as smooth as you can with them. You just smart off to them, just try to smart off to them, make them mad cause like-that's all I was doing was really just mouthing off.

The defendant further testified he was seated next to his father at police headquarters, and his father intimidated him, so he confessed to the crime. The defendant explained he was fearful of his father, and his father had always said "the worst thing you can be is a snitch."

The defendant further testified he "probably" threatened to shoot the victim's mother, but did so to try to scare her out of the house so "no more innocent bystanders [would get] hurt;" he got blood on his shorts while attempting to protect the victim by trying to separate James Barnes from him; and James Barnes wiped the gun clean prior to giving it to him. The defendant further admitted he had contact with James Barnes while awaiting trial on bond, and he conceded he said he was on bond because of the person he killed, but explained it was just "everyday neighborhood talk."

Saunte Lewis Young, the defendant's sister, testified the defendant never owned jewelry; James Barnes wore jewelry; James Barnes had previously "cut" the defendant; and they had previously shot at each other. Sandra Barnes, the defendant's mother, testified the defendant and James Barnes had a bad relationship, but she had requested the defendant try to get along with him.

*State v. Barnes*, 2002 WL 1358717, at * 1-4.

Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel and a violation of his rights under the Confrontation Clause. This Court affirmed the trial court's denial of post-conviction relief. *Rhynuia L. Barnes v. State*, No. M2004-01557-CCA-R3-PC, 2005 WL 2139408 (Tenn. Crim. App. Sept. 2, 2005) *perm. app. denied* (Tenn., Feb. 6, 2006). Petitioner filed a petition for writ of error coram nobis on October 30, 2009, alleging that a letter written by his late father, confessing to the murder, was newly discovered evidence. The trial court summarily dismissed the petition because it was "filed more than one year after the statutory limitations period," and Petitioner "had been given reasonable opportunity to present such evidence at this trial and during the post-conviction proceedings."

## II. Analysis

Petitioner alleges that the post-conviction court erred in dismissing his petition for writ of error coram nobis without a hearing. A writ of error coram nobis is a very limited remedy which allows a Petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *State v. Workman*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The Supreme Court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider

both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id*. at 527-28.

A petition for writ of error coram nobis relief must be dismissed as untimely filed unless filed within one (1) year of the date on which the petitioner's judgment of conviction became final in the trial court. *Mixon*, 983 S.W.2d at 670. The only exception to this is when due process requires a tolling of the state of limitations. *Workman*, 41 S.W.3d at 103. Judgment becomes final, for purposes of error coram nobis relief, thirty days after the entry of the judgment in the trial court if no post-trial motion is filed. *Mixon*, 983 S.W.2d at 670. In this case, the petition for writ of error coram nobis was clearly filed outside the limitations period. The limitations period would have begun to run after March 8, 2001, the date when Petitioner's motion for new trial was denied. The petition was not filed until October 30, 2009.

"Although coram nobis claims are also governed by a one-year statute of limitations, the State bears the burden of raising the bar of the statute of limitations as an affirmative defense." *Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). This Court has stated that "the statute of limitations is an affirmative defense which must be specifically plead or is deemed waived." *Newsome v. State*, 995 S.W.2d 129, 133 n. 5 (Tenn. Crim. App. 1998). In the present case, it does not appear that the affirmative defense of the statute of limitations was properly raised since the record contains no response to the petition filed by the State, and the trial court summarily dismissed the petition based on a finding that the petition for writ of error coram nobis was untimely filed. Nonetheless, we conclude that any error in dismissing the petition based on the statute of limitations was harmless and summary dismissal was proper because Petitioner has not alleged newly discovered evidence that would require relief pursuant to a writ of error coram nobis. The trial court, in effect, did a *Workman* analysis and found that strict application of the statute of limitations would not deny Petitioner a reasonable opportunity to present his claim that his father committed the homicide for which Petitioner was convicted. Petitioner, in his petition, raised the problem with filing outside the statue of limitations and his reasons why the limitations period should be tolled. He asserted that "the life sentence in this case is a sufficiently [sic] period of time to warrant a due process analysis despite the lapse of the statute of limitations."

Petitioner argues that an unsigned, undated letter, written by his late father claiming to be the perpetrator of the murder, and not discovered until a few days prior to April 14, 2009, is newly discovered evidence. He claims that he did not know that the letter existed

until his mother was cleaning out a room containing some of his father's personal belongings. Therefore, he could not have presented the evidence at trial, at the motion for new trial, or in any other proceeding. However, as pointed out by the trial court in the order denying the petition for error coram nobis, Petitioner's defense at trial was that his father committed the murder and that he was intimidated by his father to confess to the crime. Petitioner also testified at trial that his father shot the victim. Petitioner impeded his trial counsel by not giving her information on how to locate his father, and he instructed her not to contact him. Therefore, his father could not be called to testify at trial.

The record also reflects that on July 13, 2002, Petitioner's father wrote him a letter that included the following statement:

> Look, I called your mom and asked her for your lawyer's [n]ame and number so I could call and talk to him about what [I] could do to help you with your case. I am gonna tell him I [am] willing to come forward and take my case. You did not kill [any]body. I done it and I will tell your lawyer that when I call him. [I] am sorry for how things turned out.

Petitioner filed his petition for post-conviction relief on July 1, 2003, but apparently did not present this letter in support of a claim of ineffective assistance of counsel or actual innocence, **or** in a coram nobis petition within a reasonable time of the July 13, 2002, letter. Additionally, in his petition, Petitioner states that on October 31, 2002, just before his death, his father made an oral confession to Petitioner's mother that he (the father), and not Petitioner killed the victim. Petitioner called his mother to testify at the hearing on his post-conviction petition, but she did not mention the oral confession. *Rhynuia L. Barnes v. State*, No. M2004-01557-CCA-R3-PC, 2005 WL 2139408 (Tenn. Crim. App. Sept. 2, 2005) *perm. app. denied* (Tenn., Feb. 6, 2006). As noted by the trial court, in Petitioner's direct appeal, this Court found:

> The state's proof established the following. The defendant entered the victim's home brandishing the murder weapon, demanded his jewelry, and told the victim's mother he intended to kill the victim and, not being able to unlock the back door, reentered through the front door. He threatened to kill the victim's mother. The victim was shot three times at close range; the defendant discarded the weapon outside; and the defendant confessed to the crime at the police station, stating his father had "nothing to do with it."

*Barnes*, 2002 WL 1358717, at * 12.

Additionally, this Court stated in the appeal from the denial of post-conviction relief:

The record reflects that overwhelming proof was presented at trial implicating the petitioner as the murderer. Specifically, the evidence established that the petitioner requested that Morrell summon the victim from his home, that the petitioner brandished a weapon, and that he accused the victim of stealing his jewelry. The record further reflects that the petitioner chased the victim to the back of the residence and threatened to kill the victim's mother if the victim did not come out. The petitioner then ran outside as Barnes entered the residence to inquire as to his son's whereabouts. Immediately thereafter, the victim was shot three times and died as a result. During an interview at the police station following the incident, the petitioner confessed to killing the victim. We therefore conclude that due to the overwhelming proof of the petitioner's guilt, his inability to cross-examine Barnes was harmless beyond a reasonable doubt.

*Barnes*, 2005 WL 2139408, at *6.

Accordingly, we conclude that a strict application of the statute of limitations in this case would **not** deny Petitioner a reasonable opportunity to have presented the claim of newly discovered evidence. Petitioner did not present written proof of his claim in the nature of a "confession" by his father in a signed and dated document within a reasonable time period. Instead, he waited seven more years to rely on an unsigned, undated document.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE